DA 11-0151

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 325

LEWISTOWN MILLER CONSTRUCTION CO., INC.,

      Plaintiff and Appellee and Cross-Appellant,

  v.

GARY MARTIN,

      Defendant, Third-Party Plaintiff and Appellant,

  v.

RICHARD T. MILLER,

      Third-Party Defendant and Appellee.

APPEAL FROM:    District Court of the Tenth Judicial District,
                   In and For the County of Fergus, Cause No. DV 09-85
                   Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Todd A. Stubbs; Moore, O'Connell & Refling, PC. Bozeman, Montana

      For Appellee:

            Torger Oaas, Attorney at Law; Lewistown, Montana

                            Submitted on Briefs:  October 12, 2011

                                    Decided:  December 30, 2011

Filed:

                                    _____
                                           Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Gary Martin (Martin) appeals from the judgment entered by the Tenth Judicial District, Fergus County, in an action by Lewistown Miller Construction Co., Inc., (LMCC) to foreclose a construction lien.  LMCC cross-appeals from the denial of statutory attorney fees.  We affirm in part, reverse in part, and remand.  We address the following issues:

¶2      *1.  Did the District Court err in ordering foreclosure of the construction lien?*

¶3      *2.  Did the District Court err in denying attorney fees to the parties?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4      Martin owns land near Roy, Montana.  Martin hired Baywood Homes (Baywood), a professional design and building company, to create a design concept for a dwelling to be constructed on his property.  This dwelling was designed with a three-car garage on the lower level and upper living quarters.  Custom dog kennels, similar to those Martin had constructed on three of his other properties, were also designed.  Martin described the dwelling as a "hunting cabin."  Baywood helped Martin solicit bids from contractors for construction of the dwelling, and LMCC was one of three contractors that submitted a bid.  The bid request required an immediate start.  Richard Miller, sole shareholder of LMCC, testified that he felt rushed when he calculated the bid but acknowledged that he could have declined to submit a bid.  LMCC's bid was for $338,400.00, and Martin

2

accepted the bid. LMCC and Martin then entered into a written contract that incorporated by reference the "Bid and Specifications" provided by LMCC.

¶5     The exact costs of labor and materials on some components of the building were undetermined at the time the parties entered into the contract. Rather, LMCC included estimates of product and installation costs of these components. The estimates are called "allowances." Included in the contract price were the following allowances:

  (a)  Plumbing: $4,000.00
  (b)  Cabinets, counter tops, and vanities: $7,000.00
  (c)  Walk doors, handles, and locks: $500.00
  (d)  Wood stove: $3,000.00
  (e)  Lighting fixtures: $5,000.00

If actual costs exceeded these allowances during construction, such overruns were considered to be in excess of the agreed contract price of $338,400.00.

¶6     The contract required that changes must be in writing (referred to herein as "the change order process"). The contract included the following provisions:

  . . .

  (5) In the event Owner desires materials which exceed the specifications and drawings attached thereto, such materials shall be the subject of a separate written agreement in the form of a Change Order between the parties with respect to additional compensation due Contractor for the purpose and installation of such items.

  (6) It is expressly understood that any changes, additions and deductions from the drawings and specifications herein must be agreed upon in writing by both parties hereto before the same can be effected.

  (7) Attached hereto and by this reference fully incorporated herein, is the **Bid and Specifications** which, unless specifically altered in writing between the parties hereto and unless contrary to the express provisions of

3

this agreement, are binding and controlling upon the parties with respect to design and materials to be used. [Emphasis in original.]

As the project progressed, many changes were made. According to the parties, the written change order process was used only once, adding the installation of cultured stone on the walls behind the stove, a 30-inch raised hearth, a one-ton capacity electric hoist and railing, and application of epoxy on the new concrete garage floor. These changes increased the bid price by $5,145.00. However, this "change order" was attached to and signed at the same time as the construction contract. The contract price for the cabin was $343,545.00, which is the sum of the bid price ($338,400.00) plus the cost of the additions specified in the change order ($5,145.00). Thus, the "change order" was in name only, and in reality constituted additional negotiation of the terms of the original contract, not a modification of it. Because the original contract incorporated these requests and increased the price accordingly, the actual change order process was never used.

¶7    Martin requested many changes, which LMCC implemented during construction. Although not in the Bid and Specifications, Martin requested that the handles on the cabinets and doors be changed to special deer antler handles, made by hand. Martin testified, "I saw some of the antler work . . . and I got the idea for antler pulls on the cabinets and doors. I asked [Miller] if he could have those made . . . ." Martin requested that LMCC install a water filtration system. He testified, " . . . I wanted a five micron filter and a UV and ultraviolet light to make sure the water was pure that I would be consuming in the house." Martin requested that LMCC line the closets with cedar, install

4

Plexiglas on the railings on the deck to reduce the wind, install log handrails on the stairs, and install a painted air conditioning unit because ". . . the air conditioning unit, as purchased, was white and I wanted it to match the décor in the room . . . ." Martin requested installation of a "buck pole" for hoisting game, which required a pulley system, the pouring of a concrete base, and finishing to match the pole to the other wood used in the construction. Martin requested additional tile work that was not included in the allowances. Martin testified that he selected lights and heaters that exceeded the allowances. Other changes or additions that LMCC implemented included the use of hand-pounded, blacksmithed bolts on the decorative trusses along the cathedral ceiling, additional materials for the dog kennels, a firewood pulley system that was changed from bid to antique,[1] revising the wiring for the lighting, decorative outlets and light switches, a different wood stove, and the addition of ghost wood wainscoting on the bedroom walls, among other items. Martin testified that he made payments above the contract price for some of these changes, but LMCC disputed the sufficiency of the payments. The change order process was never used.

¶8    In addition to the changes Martin acknowledges, LMCC claimed that Martin requested further changes, which Martin disputed. One item was a custom cupola for the top of the cabin. LMCC claimed the original cupola was to be a standard structure but that Martin required LMCC to custom-build the cupola, which was installed. LMCC

---

[1] The District Court found that the "hoist system for big game processing . . . was changed from Bid to antique," but this is inconsistent with the testimony of the parties, both of whom stated that it was the firewood pulley system (sometimes referred to by the parties as the "hay trolley") that was changed from bid to antique.

claims it had to custom-build wooden vents for placement on the dormers to match the wood used for the siding. LMCC argued that the contract called for wooden garage doors but that Martin requested the doors be the same as those installed at his Canadian home, which were steel. LMCC's bid states, "Garage Overhead Doors Number <u>3</u> Size <u>9'x9'</u> Type <u>Wood</u> (See Plan)," but Martin testified, "[o]ur intent or, my intent, was to replicate exactly the garage door system and garage doors that we used in our Canadian home." The change order process was not used for these matters, and Martin made no payments for what LMCC claimed in additional construction and labor costs.

¶9     The contract specifications called for skip-sawn cypress flooring, but Miller could not locate this material. After discussion, LMCC suggested Martin use a product called ghost wood as a substitute, to which Martin agreed. Again, neither party used the change order process. Installation of the ghost wood required planing and application of a gym-floor finish to counter the floor's tendency to give off slivers. Martin objected to additional labor costs, stating Miller "should have been diligent enough in the choice of ghost wood to have learned that it was going to require additional finishing."

¶10    Miller testified to his belief that the contract had been changed during the course of construction to a "time and materials" contract, rather than a firm-price contract, because of the numerous changes Martin requested. He acknowledged that the parties did not create any writing that would indicate this change had taken place. Martin strongly disagreed, believing the contract remained one for a firm price, subject only to his alterations.

¶11　Throughout the course of construction, LMCC sent itemized invoices detailing costs and labor to Martin. Martin would make payments on these invoices. Martin sent several e-mails to LMCC requesting "a reconciliation" of the costs of the project. Miller responded once, telling Martin he would do his best to put something together, but he did not provide anything further. Miller testified, "I was just confused with these e-mails because I knew we were working on a time and material basis and I was already sending him itemized costs with the billings of everything that was in it." When construction was completed, LMCC sent a final bill to Martin in the amount of $79,293.01.[2]

¶12　Martin refused to pay additional amounts, and LMCC filed a construction lien on the property. LMCC filed suit, seeking damages for breach of contract, unjust enrichment, and foreclosure of the lien. Martin counterclaimed for declaratory relief that the lien is invalid, to quiet title, for slander of title, for breach of contract, breach of the implied covenants of good faith and fair dealing, breach of the implied warranty of workmanlike construction, fraud, and a request to pierce LMCC's corporate veil. Martin also filed a third-party complaint against Miller personally, alleging constructive fraud and actual fraud.

¶13　The District Court held a bench trial. It granted foreclosure of LMCC's construction lien and awarded $62,649.51. It also ruled in favor of Martin on his counterclaim for LMCC's installation of a faulty roof and leaky windows and garage

---

[2] The record reflects some discrepancy on the amount LMCC claimed. At trial, LMCC submitted evidence claiming it was owed $30,000 for labor and $48,311.89 for material costs in excess of the allowances, which totals $78,311.89 over the contract price, rather than the $79,293.01 stated in its final bill.

doors, awarding $10,260.20. The court denied LMCC's request for statutory attorney fees for prevailing on the construction lien foreclosure and denied Martin's request for contractually-based attorney fees for prevailing on the counterclaim.

¶14 Martin appeals from the court's grant of the lien foreclosure and denial of contractual attorney fees, and LMCC appeals from the court's denial of statutory attorney fees.

## STANDARD OF REVIEW

¶15 We review the findings of a trial court sitting without a jury to determine if the findings are clearly erroneous. Rule 52(a), M. R. Civ. P. Findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that the trial court made a mistake. *Norwood v. Serv. Distribg., Inc.*, 2000 MT 4, ¶ 21, 297 Mont. 473, 994 P.2d 25 (citation omitted). In determining whether the trial court's findings are supported by substantial credible evidence, we will view the evidence in the light most favorable to the prevailing party. *Norwood*, ¶ 21 (citation omitted).

¶16 A district court's determination of damages is a factual finding that must be upheld if it is supported by substantial evidence. We will not overturn a district court's determination of damages unless it is clearly erroneous. Speculative damages are not recoverable. *Watson v. West*, 2009 MT 342, ¶ 18, 353 Mont. 120, 218 P.3d 1227 (citations omitted).

8

¶17    We will review a trial court's conclusions of law for correctness. *Norwood*, ¶ 22 (citation omitted).

## DISCUSSION

¶18    ***1. Did the District Court err in ordering foreclosure of the construction lien?***

¶19    The District Court did not enter findings that the contract was for a firm price rather than for time and materials, but that finding is clearly implicit in its ruling. "Any findings not specifically made but necessary to the judgment are deemed to have been implied if supported by the evidence." *Berry v. Romain*, 194 Mont. 400, 407, 632 P.2d 1127, 1132 (1981). However, the District Court held that Martin waived the contractual provisions in the contract requiring changes to be in writing. In the District Court's words, "the evidence before the Court is unequivocal that Defendant made oral requests for change knowing that such changes were to be in writing. He requested a customized sink, antler door/cabinet handles, dog kennel water system, blacksmithing, patio decking, cedar-lined closet, etc., etc., etc." It further held that Martin's requests for additions and changes constituted executed oral modifications to the contract because LMCC had performed the changes at Martin's request, and Martin had already paid for many of the changes. The District Court found that Martin sent several e-mails that sought "to indicate the contract price is determinative," but that these e-mails also demonstrated that Martin understood he had made changes to the project that affected the firm contract price.

9

¶20 Martin asserts the District Court misapprehended the effect of the evidence, and therefore its findings are not supported by substantial credible evidence. He argues the court misunderstood the effect of the e-mails, which then led the court to the incorrect conclusion that he waived the provisions requiring contract changes to be in writing, offering that he should "not [be] responsible to pay the alleged additional costs based upon the clear fact that Mr. Martin was continually holding Lewistown Miller to the Firm Contract Price."

¶21 With regard to construction contracts, we have stated that "[w]aiver may be proved by express declarations or by a course of conduct so as to induce the belief that the intention and purpose was to waive." *Mathis v. Daines*, 196 Mont. 252, 258, 639 P.2d 503, 506 (1982) (citing *Northwestern Fire & Marine Ins. Co. v. Pollard*, 74 Mont. 142, 149, 238 P. 594, 596 (1925)). The District Court determined that Martin had waived the provisions requiring a writing because of his repeated oral requests for changes without himself complying or requiring LMCC to comply with them, as well as Martin's payments for some of the requested changes, giving LMCC the reasonable belief that it would be paid for all of the changes requested by Martin. We cannot disagree. As Williston has explained:

> In a basic sense, the concept of 'waiver' as an excuse for nonperformance is an equitable doctrine, designed to prevent the waiving party from lulling another into a belief that strict compliance with a contractual duty will not be required, and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction.

10

Samuel Williston & Richard A. Lord, *Williston on Contracts* vol. 13, § 39.15, 564, (4th ed., West Group 2000). Martin cannot "lull[]" LMCC "into a belief that strict compliance with a contractual duty will not be required, and then . . . demand[] compliance for the purpose of avoiding the transaction." Williston, vol. 13, § 39.15, 564. By his actions, Martin waived the right to require that changes be in writing.

¶22   Alternatively, Martin argues that, if he waived the contract provisions requiring a writing, he only did so as to those changes for which he had already paid, citing *Matos v. Rohrer*, 203 Mont. 162, 661 P.2d 443 (1983). Referencing § 28-2-1602, MCA, which provides that "[a] contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise," Martin argues that the District Court erred by enforcing the changes as oral modifications to the contract because the modifications were not fully executed by both parties, in that he did not pay for all of them. Martin relies on *Winkel v. Family Health Care, P.C.*, 205 Mont. 40, 45, 668 P.2d 208, 210 (1983) and *Westfork Const. Co. v. Nelcon, Inc.*, 265 Mont. 398, 402-03, 877 P.2d 481, 484 (1994), for the proposition that "[a]n oral agreement altering a written agreement is not an executed oral agreement within the statute authorizing modification of written contracts by an executed oral agreement unless its terms have been fully performed, and performance on one side is not sufficient . . . . An executed contract is one where nothing remains to be done by either party." *Winkel*, 205 Mont. at 45, 668 P.2d at 210. In sum, Martin's argument is that, because he has not paid for many of the changes, despite

LMCC's full performance, performance on both sides has not occurred, and therefore, the modifications are executory rather than executed.

¶23 Martin does not cite authority demonstrating that a party's failure to make payment for requested services, provided by the other contracting party, renders such contract modification merely "executory" in all cases. Such a proposition would allow the party requesting changes to avoid the obligation to pay by simply refusing to pay after the changes were provided. While the payment is executory, the modification is supported by consideration and has been performed. Performance by the contractor has been obtained upon the owner's request and promise to pay. As stated in *Corbin on Contracts*, which discusses Montana's modification statute as well as similar statutes from California and New York:

> One party should not be deprived of a remedy when it performs in reliance on an oral promise of other [sic]. A building contractor that performs extra work at the oral direction of the owner or the architect in reliance on an oral promise of compensation should be granted a remedy even though *the owner's promise of compensation* is still "executory."

Arthur L. Corbin & Sarah Howard Jenkins, *Corbin on Contracts* vol. 13, § 71.2 (3), 425 (Joseph M. Perillo, ed., rev. ed., Matthew Bender & Co., Inc. 2003) (emphasis added). This approach is supported by previous decisions of this Court. The footnote to the above-cited section of *Corbin* cites our decision in *Dalakow v. Geery*, 132 Mont. 457, 318 P.2d 253 (1957). *See also Haines Pipeline Constr., Inc. v. Mont. Power Co.*, 251 Mont. 422, 830 P.2d 1230 (1991) (overruled on other grounds by *Porter v. Galarneau*, 275 Mont. 174, 911 P.2d 1143 (1996)); *Matzinger v. Remco, Inc.*, 171 Mont. 383, 558

12

P.2d 650 (1976) (written contract modified by oral agreements and plaintiff entitled to compensation for work performed pursuant to oral modifications); *Gramm v. Ins. Unlimited*, 141 Mont. 456, 378 P.2d 662 (1963) (written change order provision waived by defendant's conduct and plaintiff entitled to compensation because defendant cannot take advantage of his own omission to escape liability for work substantially performed); *Dalakow*, 132 Mont. at 464, 465, 318 P.2d at 257, 258 ("In *Roberts v. Sinnott* . . . it will be noted that defendant did not in effect execute his part of the agreement, i.e., payment. This court however did not deny that an oral modification had been effected merely because of that fact . . . in cases where there is adequate consideration for the oral modification and the party relying thereon has fully performed, the written contract will be enforced as modified whether or not the other party has fully performed on his part.") (citations and quotations omitted); *Roberts v. Sinnott*, 55 Mont. 369, 177 P. 252 (1918) (written change order provision waived, oral modifications are valid despite defendant's failure to perform, i.e. pay, for the work performed by plaintiff).

¶24    *Westfork* does not stand for the proposition that a subsequent oral agreement is not fully executed and does not modify a prior written agreement if payment has not been made.    In *Westfork*, we determined there was no subsequent agreement, not that the agreement had not been executed. *Westfork*, 265 Mont. at 404-05, 877 P.2d at 485 ("The evidence within the record provides only one reasonable conclusion—that the written subcontract provided the terms of the agreement between the parties.").    Martin also heavily relies on *Matos*, 203 Mont. 162, 166 P.2d 443, but the facts there were different.

13

The owners in *Matos* requested changes, but in so doing, "told [the contractor] Matos if he couldn't finish the house for between $ 90,000 and $ 91,000, then 'he and the workmen should just quit, and we would finish it as we could afford to.'" *Matos*, 203 Mont. at 166, 166 P.2d at 445-46. However, the contractor continued to work. The trial court found that a firm ceiling on cost had been set, which the contractor had violated, and we affirmed. *Matos*, 203 Mont. at 171, 166 P.2d at 448. Here, Martin attached no such ceiling to his requests. We conclude that Martin was obligated to pay for the changes he ordered during construction.

¶25 Martin also challenges the District Court's calculation of the amounts he owed because LMCC's invoices submitted for materials and labor for the project did not indicate "the additional cost for each change in plans, and the costs for additional labor beyond the labor Lewistown Miller figured in its Bid and Specifications." Martin points to the District Court's reduction of LMCC's damage claim by the figure of 20% for LMCC's responsibility in causing the overages, which Martin says is illustrative of the speculative nature of the court's determination.

¶26 The District Court did describe the evidence and testimony concerning damages as "disheveled." Our review of the record confirms this assessment, as the evidence concerning the communications and changes made during the course of construction did not lay a clear and concise story. However, it is evident that the District Court carefully considered the evidence, and, as the trier of fact, it was in the best position to assess the testimony and make ultimate determinations about each party's contributions to the

14

overages. About Miller's bid, the court found that "[b]y submitting a bid under rushed conditions, Miller admitted that LMC assumed the risk of under-estimating the costs of construction of the cabin," and that Miller "admitted he had some responsibility for the higher cost resulting from these problems because he did not have time to engineer the necessary support system." The court found that "Miller admitted that he did not accurately bid either the decorative beams and trusses and the costs required to build the dog kennels."

¶27 Ultimately, good sense, rather than mechanical application of formulas, must be applied to determine damages. *Kebschull v. Nott*, 220 Mont. 64, 66, 714 P.2d 993, 994 (1986). Based on our review of this record, we conclude the amount of damages determined by the District Court on the lien foreclosure matter was not clearly erroneous. The District Court's findings are supported by substantial credible evidence, and the conclusions of law are correct.

¶28 ***2. Did the District Court err in denying attorney fees to either of the parties?***

¶29 Both parties argue they should have been awarded attorney fees. LMCC argues it is entitled to attorney fees on the lien foreclosure pursuant to § 71-3-124(1), MCA. Martin argues he is entitled to contractually-based attorney fees for prevailing on his counterclaim.

¶30 Whether or not a party is entitled to attorney fees is strictly a question of law, and we will review the district court's grant or denial of attorney fees for correctness. *Avanta Fed. Credit Union v. Shupak*, 2009 MT 458, ¶ 22, 354 Mont. 372, 223 P.3d 863.

15

Section 71-3-124(1), MCA states, "In an action to foreclose [a construction lien], the court *shall* allow as costs the money paid and attorney fees incurred for filing and recording the lien and reasonable attorney fees in the district and supreme courts. The costs and attorney fees *must* be allowed to each claimant whose lien is established . . . ." (Emphasis added.) As noted by LMCC, the language of the statute is mandatory. The courts do not have discretion in determining when a party, which has established its lien, is entitled to these mandatory attorney fees. *See Matzinger*, 171 Mont. at 389, 558 P.2d at 653; *Hanzel v. Marler*, 237 Mont. 521, 524, 774 P.2d 426, 427-28 (1989). Because LMCC established its lien, it is entitled to the statutorily mandated attorney fees, and the District Court erred in failing to award them.

¶31 Martin argues he is entitled to attorney fees for prevailing on his counterclaim. Ordinarily, attorney fees are not awarded in contract disputes absent contractual or statutory authority. *Boehm v. Cokedale, LLC*, 2011 MT 224, ¶ 26, 362 Mont. 65, 261 P.3d 994. The contract between Martin and LMCC contains the following provision: "15. If the institution of legal action by either party is necessary to enforce the provisions of this agreement, the prevailing party shall be entitled to all costs reasonable [sic] incurred relative thereto, including attorney's fees."

¶32 Generally, the party obtaining a net judgment is considered the prevailing party in an action involving a counterclaim. *Avanta Fed. Credit Union*, ¶ 49 (citing *Rod and Rifle Inn, Inc. v. Giltrap*, 273 Mont. 232, 235, 902 P.2d 38, 41 (1995)). "The party that survives an action involving a counterclaim, setoff, refund or penalty with the net

16

judgment should generally be considered the successful or prevailing party." *E.C.A. Envtl. Mgt. Servs. v. Toenyes*, 208 Mont. 336, 345, 679 P.2d 213, 218 (1984) (citations omitted). Although Martin won on his counterclaim, he did not "survive[] [the] action . . . with the net judgment." *Toenyes*, 208 Mont. at 345, 679 P.2d at 218. As such, Martin is not the prevailing party and is not entitled to contractual attorney fees.

¶33 We reverse the denial of LMCC's attorney fees on the foreclosure and remand this matter to the District Court to determine the reasonable attorney fees due LMCC in conformity with the test for reasonableness set forth in *Plath v. Schonrock*, 2003 MT 21, 314 Mont. 101, 64 P.3d 984. Because Martin's damages for LMCC's breach of the contract will be deducted from the damages and attorney fees Martin owes LMCC, we find it unnecessary to address Martin's request to pierce LMCC's corporate veil.

¶34 Affirmed in part, reversed in part, and remanded for further proceedings in accordance herewith.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS